[Cite as *State v. Baker*, 2014-Ohio-3163.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                           :

    Plaintiff-Appellee                 :           C.A. CASE NO.    25828

v.                                      :           T.C. NO.    11 CR 4317/2

LARRY BAKER                             :           **<u>FINAL ENTRY</u>**

    Defendant-Appellant                :

                                       :

. . . . . . . . . .

**O P I N I O N**

Rendered on the _____18th_____ day of _____July_____, 2014.

. . . . . . . . . .

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ELIZABETH C. SCOTT, Atty. Reg. No. 0076045, 120 W. Second Street, Suite 603, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

    **{¶ 1}** Larry Baker was found guilty by a jury in the Montgomery County Court of Common Pleas of four counts of murder, one count of aggravated robbery, and one count of felonious assault, each with a firearm specification. After merger of some of the

counts, Baker was sentenced to two consecutive terms of 15 years to life on each of two counts of murder, and to three additional years on each of two firearm specifications, to be served consecutively to each other and to the sentence for the murders; the aggregate prison term was 36 years to life.   Baker appeals, raising three assignments of error.

{¶ 2}   For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3}   All of the offenses relate to a robbery and shooting at the Cash and Go pawn shop on December 22, 2011.   Baker and two accomplices, Darren Taylor and Anthony Dewayne McClain, were alleged to have driven to the pawn shop from Detroit that morning and to have robbed the shop and shot its employee, Ilya Golub.   Golub returned fire, striking McClain, but the three alleged perpetrators managed to flee and returned to Detroit.   Golub and McClain died from their gunshot wounds.

{¶ 4}   Baker was later charged with four counts of murder (two as a proximate result of aggravated robbery, and two as a proximate result of felonious assault), two counts of aggravated robbery with a deadly weapon, and two counts of felonious assault with a deadly weapon.   Each count included a firearm specification.   Baker was tried by a jury on June 2013, and was convicted on all counts.[1]   The four counts of which Golub was the victim (two counts each of murder, aggravated robbery, and felonious assault) were merged, and the two counts of murder related to McClain were merged.   As discussed above, Baker was sentenced to an aggregate term of 36 years to life.

---

[1]Taylor was charged with the same offenses, as well as having weapons while under disability; he was also convicted on all counts.  We affirmed the convictions in *State v. Taylor*, 2d Dist. Montgomery No. 25764, 2014-Ohio-2550.

{¶ 5} Baker raises three assignments of error on appeal. His first two assignments challenge the weight and sufficiency of the evidence, and we will address them together.

{¶ 6} An argument based on the sufficiency of the evidence challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Under a sufficiency analysis, an appellate court does not make any determinations regarding the credibility of witnesses. *State v. Goff*, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998), citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 7} In contrast, when reviewing an argument challenging the weight of the evidence, "'[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v.*

*Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 8} Where an appellate court determines that a conviction is not against the manifest weight of the evidence, the conviction is necessarily based on legally sufficient evidence. *State v. Million*, 2d Dist. Montgomery No. 24744, 2012-Ohio-1774, ¶ 23; *State v. Combs*, 2d Dist. Montgomery No. 19853, 2004-Ohio-2419, ¶ 12.

{¶ 9} The State established the following facts at trial.

{¶ 10} On Thursday, December 22, 2011, Baker, Taylor, and McClain had cell phone conversations in the early morning hours and departed together from Detroit in Taylor's green and tan Pontiac Astro van. They drove to the Dayton area and parked a short distance from the Cash and Go pawn shop on Salem Avenue. Ilya Golub opened the shop at 9:00 a.m, and Taylor entered the shop. Baker and McClain entered the establishment about five minutes after Taylor; Baker carried a backpack. Video surveillance tapes showed that, after Baker and Taylor walked up and down the aisles of the shop, the men converged near the counter and confronted Golub. Taylor shot Golub several times at close range. Golub managed to return fire as the men were leaving the shop, striking McClain.

{¶ 11} The three men ran to the van, turned it around on a side street, and drove on Salem Avenue toward Interstate 75. A man who had been eating breakfast at a restaurant across the street from the pawn shop saw the three men run from the shop and enter the green Astro van, but he was unsure which man was driving. He ran to his car and followed the van until it entered the highway. He then returned to the pawn shop and gave the van's Michigan license plate number to sheriff's deputies, who had arrived at the scene. Several witnesses testified that a silver gun was on the ground in the pawn shop parking lot.

{¶ 12} Another employee of the pawn shop testified that he had arrived for work a few minutes late on December 22, 2011, and found the door "busted" (the glass had been shot out) and Golub on the floor behind the counter with a gun in his hand; Golub was not moving. The employee testified that Golub was known to carry a gun in the store and that the store kept large amounts of cash in a safe to facilitate loans. No testimony was offered about what, if anything, was taken from the pawn shop.

{¶ 13} The deputies broadcast a description of the van; they also recovered the revolver from the parking lot and spent casings from in and around the pawn shop and from the exterior of the building across the street. They discovered that the van was registered to Taylor.

{¶ 14} Sherri Webb, a cousin of Taylor and an emergency medical technician in Michigan, testified that she received a series of phone calls from Taylor on December 22, 2011, beginning at approximately 10:00 a.m. Taylor stated that his friend had been shot, and Webb provided Taylor with instructions on performing CPR and information about the locations of hospitals along Interstate 75 in Ohio and Michigan along the route to Detroit. Taylor later told Webb that he "dumped Wayne" (McClain) on Kirby Street in Detroit. Webb testified that Kirby was not far from I-75. Webb contacted the police in an effort to save McClain (although she did not know his identity at the time).

{¶ 15} At approximately 1:10 p.m. on December 22, 2011, McClain's body was found in an alley near 609 East Kirby Street in Detroit, with bullet wounds in the elbow and upper back.

{¶ 16} Fatimah Muhammad, one of Taylor's girlfriends, testified that Taylor came

to her house around 3:00 p.m. on December 22, and entered through the back door, which was unusual. Her garage was about 15 feet from the back door. She testified that Taylor was very upset when he came in, and was crying, but that he did not stay long. He was picked up by someone in a red SUV, and went to an appointment with his parole officer. She never saw him or the red SUV again. She later learned that the red SUV belonged to Baker.

{¶ 17}  By the afternoon of December 22, the Montgomery County Sheriff's Office was working with a cellular service provider to obtain information about the real-time location of two phones associated with Taylor. The sheriff's department asked the Southfield, Michigan, police department to set up surveillance on Taylor, and it informed the Southfield police that Taylor might be at a certain address. The Southfield police recognized this address as a parole office and responded to that address while Taylor was still in the building. While Taylor was being arrested at the parole office, his cell phones received several incoming calls from "Larry."

{¶ 18}  On December 23, 2011, Montgomery County Sheriff's Office detectives, working in conjunction with the Michigan State Police, used cell phone records to identify a connection between Taylor and "Larry" (Baker), and they obtained a photograph of Baker. When this photograph was compared with the video from the pawn shop robbery, Baker was identified as a suspect, and a search warrant was obtained for his home on Santa Rosa Drive in Detroit. McClain's wallet was found under a mattress in the home, but Baker's location was unknown at that time. A warrant was issued and he was arrested at his home in February 2012.

{¶ 19}   Also on December 23, Taylor's van was found parked inside the garage at Muhammad's home.   An atlas, cleaning supplies, rags, and a lottery ticket were found in the van.   Muhammad, who did not store a car in her garage, testified that she had been unaware that Taylor's van was parked in her garage until the police arrived.   A large red stain was present on the second row of seats inside the van, some of which appeared to have been bleached.   Muhammad testified that she had ridden in the van on Wednesday, December 21, and the cleaning supplies, the blood stain, and the lottery ticket had not been in the van at that time.

{¶ 20}   The lottery ticket found in the van was purchased on December 22, 2011, at 1:04 p.m.   The ticket led the Michigan State Police to a lottery terminal at a CVS in Detroit, four to five blocks from Kirby Street. Surveillance videos from the CVS at the relevant time showed two men drive into the parking lot in a 1995 Pontiac minivan matching the description of the van involved in the pawn shop robbery; surveillance video inside the store also showed Baker, dressed in the same clothing as in the pawn shop video, purchasing a lottery ticket.   The other man stayed in the van, which remained in the CVS parking lot while Baker was in the store.

{¶ 21}   Montgomery County Sheriff's Office Detective Patrick O'Connell testified that he had tracked the activities and location of the cell phone towers off of which Taylor's, McClain's and Baker's cell phones had "pinged" the morning of December 22, 2011.   He documented that the men had exchanged phone calls during the night and that, beginning shortly after 4:40 a.m., the coordinates of their travel had generally followed a path from Southfield, Michigan to Santa Rosa Avenue in Detroit (Baker's residence), south along I-75

to Toledo and on to Dayton, where there was a ping 1/4 mile from the pawn shop, and then north again along I-75 to Detroit and a location near Kirby (where McClain's body was dumped), to the area of Muhammad's house, and then to the parole office.

{¶ 22} An inmate who spent some time in the same pod with Baker at the Montgomery County Jail testified that, in talking about why he was in jail, Baker had described "[being] on a roll" from Detroit when he committed a robbery involving a shoot-out. According to the fellow inmate, Baker claimed that he had only been driving the car and that the "other two dudes" did the shooting.

{¶ 23} DNA linked to McClain and Baker was found on the gun in the pawn store parking lot. DNA evidence found on the steering wheel and driver's door of the Astro van belonged to Taylor. The blood on the second seat of the van belonged to McClain.

{¶ 24} The forensic pathologist who conducted the autopsy of McClain testified that, based on his injuries, McClain could have run a short distance after he was shot. He also testified that McClain would likely have survived the "tension pneumothorax" that killed him, if he had received treatment.

{¶ 25} Baker did not call any witnesses at trial. His attorney did not deny that Baker had made the trip from Detroit to Dayton with his friends or that he had been present at the robbery and shooting; the defense asserted that Baker had been a mere bystander during the robbery and had not known that the other men intended to rob the pawn shop.

{¶ 26} The jury was instructed on complicity and aiding and abetting, as well as the principal offenses with which Baker was charged. It was further instructed that "[t]he mere presence of an accused at the scene of the crime and the fact that he was acquainted with the

perpetrator is not sufficient proof in and of itself that he was an aider or abettor." It was also correctly instructed that it could rely on direct and/or circumstantial evidence, and that it could infer facts from other facts that had been proven by the evidence.

{¶ 27} The record contains substantial competent, credible evidence upon which the jury could have reasonably concluded that Baker conspired with, assisted or encouraged Taylor and McClain in the robbery of the pawn shop. If Baker was involved with the robbery in any of these ways, it makes no difference who held or fired the gun(s) used in the offense; he would be equally guilty of robbery and murder. *See* R.C. 2923.03; *State v. Letts,* 2d Dist. Montgomery No. 15681, 2001 WL 699537, * 4 (June 22, 2001); *State v. Cochran*, 3rd Dist. Marion No. 9-81-30, 1982 WL 6795, * 5 (May 19, 1982).

{¶ 28} As stated above, the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact; the jury is free to believe all, part, or none of the testimony of each witness who appears before it. It is also permitted to draw reasonable inferences from the evidence presented. The jury chose to believe the State's version of the facts. Baker's conviction was supported by sufficient evidence, and we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.

{¶ 29} The first and second assignments of error are overruled.

{¶ 30} In his third assignment of error, Baker asserts that he was denied the effective assistance of counsel because 1) counsel lacked basic knowledge regarding the motion to suppress; 2) counsel had ineffective communication with the jury and discussed incorrect standards with the jury, and 3) counsel "frustrated the trial court" throughout the

proceedings.

{¶ 31} We review alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his or her errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.*

{¶ 32} With respect to the motion to suppress, which concerned the search warrant for Baker's residence, Baker identifies only one example of counsel's alleged "lack of basic knowledge": a question asked by defense counsel at the suppression hearing of a witness from the Michigan State Police. Defense counsel asked the witness to describe what information she had with respect to Baker's involvement in the robbery and murder before seeking a search warrant for his home. The State argued that the affidavit in support of the search warrant was beyond the scope of the issues raised in the motion to suppress and the "four corners" of the warrant, and its objection to the question was sustained. According to Baker, this question showed defense counsel's lack of understanding of the holding in *Franks v. Deleware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Counsel's next question, which asked what information the witness had received from Montgomery

County pertaining to Baker's involvement in the "incident," was allowed.

{¶ 33} Counsel's question did not, on its face, evince a lack of understanding of the law with respect to search warrants or motions to suppress. Moreover, there is no evidence in the record to suggest that the facts of this case supported a challenge to the affidavit underlying the search warrant. As such, there is no basis to conclude that counsel's failure to file a more expansive motion to suppress (based on *Franks)* demonstrated counsel's ineffectiveness or met either prong of *Strickland*.

{¶ 34} Baker also asserts that counsel displayed a lack of knowledge and "ineffective communication" during jury selection. Although he cites pages of the transcript, Baker does not otherwise present an argument as to how counsel acted ineffectively. On one of the cited pages, defense counsel commented to the prospective jurors about how they would want a defense attorney to provide zealous representation "if your son was sitting there" as a defendant; the court sustained the State's objection to the comment. At another point, defense counsel asked prospective jurors whether they thought they (the jurors) "should be accountable for the conduct of two other individuals that are not you" or of whose actions they were unaware. Again, the State's objection was sustained in open court. These examples may demonstrate that defense counsel was attempting, during voir dire, to suggest the defense's theory of the case (that Baker was an unknowing bystander to the robbery) and to ensure that prospective jurors would be capable of separating the acts of an unknowing bystander from criminal conduct of his companions; they do not demonstrate that defense counsel appeared incompetent to the jury or that he acted in a manner that prejudiced Baker in the eyes of the potential jurors. The cited pages

do not demonstrate representation that fell below an objective standard of reasonableness.

{¶ 35} Baker also cites a section of the transcript wherein the parties and the court were in chambers discussing challenges for cause. After defense counsel stated that he did not have any challenges for cause that had not already been addressed by the State, the court raised a question as to Juror # 27, who "said he was 50 yards away when [the robbery] happened. He was there when the investigation occurred" and "walked up." The judge asked, "Does that cause any hair to raise on anybody's back?" Defense counsel then asked that Juror # 27 be stricken for cause. Although defense counsel had previously passed on objections to the juror, the court "let [him] re-open" and challenge the juror for cause. The court pointed out that neither party had questioned the juror during voir dire on that issue, so that it would be more clear whether the juror could be "fair and impartial." The court then overruled the challenge for cause.

{¶ 36} We agree with the trial court that the record does not establish that there was any basis to strike Juror # 27. Although defense counsel might have questioned the juror more extensively about his presence near the scene of the crime and his observations there, defense counsel could have reasonably concluded that the prospective juror's observations after the event were unlikely to have had any bearing on Baker's guilt. This is especially true since anything the juror might have seen occurred after the shootings, and those events were not in dispute. There is no basis to conclude that defense counsel was ineffective in failing to question Juror # 27 further or in failing to take the initiative to strike him.

{¶ 37} Finally, Baker contends, without any specific references or allegations of

prejudice, that trial counsel was ineffective because he was "cantankerous" and "frustrat[ed] the trial court." Having thoroughly reviewed the record, we find no support for this assertion.

{¶ 38} Baker has not demonstrated that he was denied the effective representation of counsel.

{¶ 39} The third assignment of error is overruled.

{¶ 40} The judgment of the trial court will be affirmed.

. . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:

Andrew T. French
Elizabeth C. Scott
Hon. Dennis J. Adkins