[Cite as *State v. Fields*, 2017-Ohio-7745.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   2016-CA-76 |
| | : | |
| v. | : | T.C. NOS. 15-CR-642; 16-CR-193 |
| | : | |
| TACOTA FIELDS | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___22nd___ day of _____September_____, 2017.

. . . . . . . . . . .

ANDREW P. PICKERING, Atty. Reg. No. 0068770, Assistant Prosecuting Attorney, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
        Attorney for Plaintiff-Appellee

MARK WIECZOREK, Atty. Reg. No. 0082916, 9415 Montgomery Road, Suite D, Cincinnati, Ohio 45242
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} After his two criminal cases were consolidated for trial in the Clark County Court of Common Pleas, Tacota Fields was found guilty by a jury of murder with a firearm specification, felony murder with a firearm specification, tampering with evidence, felonious assault, and improperly discharging a firearm at or into a habitation.  Fields

was acquitted of discharging a firearm on or near prohibited premises. After merging several charges for sentencing, the trial court imposed an aggregate 32 years to life in prison.

{¶ 2} Fields appeals from his convictions, claiming that his convictions were based on insufficient evidence and were against the manifest weight of the evidence and that cumulative errors deprived him of a fair trial. For the following reasons, the trial court's judgment will be affirmed.

## I. Evidence at Trial

{¶ 3} The charges against Fields arose out of three separate incidents in August 2013. The two murder charges, the felonious assault charge, and the tampering with evidence charge stemmed from the shooting death of Schuyler Mollett on August 8, 2013; Fields was indicted on those four charges in Case No. 15CR642. The other two charges, indicted in Case No. 16CR193, were based on allegations that Fields fired multiple gun shots at two different locations in Springfield, Ohio, on August 2, 2013. The State alleged that Fields shot at a residence (Count One) and a church on Springfield-Jamestown Road (Count Two). Fields was acquitted of the charge related to the church, and we will not discuss the evidence related to that charge.

{¶ 4} The State presented 40 witnesses at trial. They can be generally grouped as eyewitnesses to the shootings, Mollett's friends, Fields's friends, law enforcement officers, and experts from the Montgomery County Coroner's Office and the Bureau of Criminal Investigation. The State's evidence at trial established the following facts.

### A. Events Leading Up to the Shootings

{¶ 5} In 2013, Fields had a group of friends, which included Dustin Frey, Elijah Hall,

Kevin Simpson, Brandon Joseph, Josh Dalton, and Ryan McDonald. Frey testified that the group would hang out, go bowling, and shoot guns at a farmhouse in Yellow Springs.

{¶ 6} Fields was in a romantic relationship with Hailey Wright. Hall and Simpson testified that Fields would complain that Wright had cheated on him (Fields), that Wright would lie to him, and that she would hang around people that Fields did not like. During the relevant time period, Fields lived with Wright and Frey.

{¶ 7} Schuyler Mollett also had a close group of friends, who called themselves the Ratchet Clique. The group consisted of Mollett, Joseph Litteral, Darren Milo, Bryant Mollett (Schuyler Mollett's cousin), and Justin Robothom. One of the friends also included Jeremy, who was then about 16 years old. Tiffany Ogle, who lived with Mollett on Stanton Street, described the group as "friends who hung out and played pool."

{¶ 8} In March 2013, Fields and his friends were at Forest Lake, a campground with a pool hall located west of Springfield. There, an argument ensued between Fields's group and the Ratchet Clique, particularly between Fields and Jeremy. The confrontation ended when the owner of Forest Lake kicked out both groups.

{¶ 9} Both groups relocated to a Wal-Mart in Springfield. There, Fields "went after" Jeremy and knocked Jeremy down. In response, Robothom punched Fields in the face, and Fields ran away. Other members of the groups also fought; Frey "got jumped" and four or five Ratchets hit him while he was on the ground. The altercation broke up within five to ten minutes, after someone shouted that the police had been called.

{¶ 10} A third altercation between the groups occurred later that night, because Fields wanted to fight Robothom, who had punched him at Wal-Mart. While driving around, members of Fields's group saw a vehicle with Ratchet Clique members, and

Fields and his friends followed the vehicle to Bryant Mollett's residence on Light Street. Fields and Robothom started to fight, and they wrestled on the ground. When Fields was on top of Robothom, Litteral (a Ratchet) kicked Fields in the face, rendering Fields unconscious. Fields's brother approached the groups with a large assault rifle, asking who had kicked Fields. The Ratchet Clique ran into Bryant's residence. The police and an ambulance later arrived and took Fields to the hospital. Frey testified that Fields would get later upset whenever anyone mentioned the March 2013 fight.

{¶ 11} Sometime after the March 2013 altercations, Fields and Frey went to Troy, where Fields purchased a two-tone black and green 9mm handgun. Fields kept the gun in his truck, a blue GMC Sonoma with HD headlights and graphics on the side.

*B. Shooting of the Hoefers' Residence*

{¶ 12} In August 2013, Brandy Hoefer had a residence on East McCreight Avenue in Springfield. She lived there with her sister, Katelyn, her mother, her boyfriend, and her son. The Hoefers' residence was diagonally across the street from the home where Fields, Wright, and Frey resided.

{¶ 13} Katelyn Hoefer and Hailey Wright were friends. Wright testified that Fields did not want Wright to be friends with Katelyn due to a past relationship he had with Katelyn. By August 2013, Wright would come by Katelyn's home "all the time." Katelyn indicated that Wright and Fields were dating when she (Katelyn) first met Wright, but Wright's relationship with Fields was "on and off." Katelyn testified that Wright would "sometimes" come by when she was having problems "in her relationship." Katelyn stated that Fields came to the Hoefers' residence once during a party, saw Wright in the basement with others, and left; Wright testified that Fields was angry to find her smoking

there, and she ran after him.   Fields was also angry at Katelyn's boyfriend, who had once hit Wright.

{¶ 14} Wright testified that one night in early August 2013, Fields told her that he was going to the gym.   After he left, Wright heard gunshots, but did not investigate. When Fields returned a couple hours later, Wright told Fields about the gunshots she had heard.   Fields responded that he had done it, because Wright was "hanging out over there all the time."

{¶ 15} Betty Lynne Herzog was friends with Brandy Hoefer and was at Brandy's home nearly every day.   On the night of August 2, 2013, Brandy had gone to a nearby Walgreens store, and Herzog and another friend of Brandy were at Brandy's home, waiting for Brandy to return.   Herzog looked out the front door to see if Brandy were coming, and then decided to sit on a couch in the front living room to wait.   Shortly after sitting down, three bullets came through the front storm door and "three or four more shots" came after that.   Herzog went back to the front door, but did not see anyone. Herzog called the police.

{¶ 16} Officer Andrew Bronsord responded to the Hoefers' address.   The officer observed two bullet holes in the storm door and bullet holes in the front of the house. Bullets struck interior walls, a couch, and a playpen.   Officer Bronsord recovered a bullet from behind the couch.   Officer Jerome Klark later responded to the Hoefers' address and collected a partial full metal jacket from under the front window of the residence.

*C.   Shooting of Schuyler Mollett*

{¶ 17} During the evening of August 8, 2013, Wright and Fields drove in Fields's truck to an auto parts store to get a steering wheel cover.   On the way home, Wright

thought she saw Katelyn's boyfriend, the man who had hit her. Fields turned around at a gas station and drove back toward the man, who was heading toward a church at Stanton Avenue and North Limestone Street.[1] Upon a second look, Wright saw that she was mistaken. However, according to Wright, Fields "was pissed * * * and said he knew who it was." Fields turned onto Stanton and parked a short distance from the church. Wright and Fields both exited the vehicle. Fields told Wright to go home if she heard anything. Wright testified that Fields walked toward the church.

{¶ 18} Wright got in the driver's seat of Fields's truck. Soon after, she heard several gunshots. Thinking Fields might have been shot, Wright drove down a street and an alley toward the church's parking lot. Wright saw "the dead body," who she recognized as the person they had just seen while driving. Wright testified that she "sped home," driving down Stanton Avenue. She did not see Fields on her way home.

{¶ 19} When Wright arrived at her home, she told Frey that Fields had shot somebody. Frey testified that Fields came home about five minutes after Wright. Wright described Fields as shirtless, sweaty, and "bent over with his hands on his knees with the gun sticking out of the back of his pants." Frey similarly testified that Fields was breathless and was not wearing a shirt. Fields told Wright that they "had to get out of town." Fields gave the two-tone 9mm gun to Frey, who put it in his trunk. Fields took the battery out of his cell phone, packed a bag, and left with Wright. Wright testified that

---

[1] North Limestone Street, Stanton Avenue, Mason Street, and East Madison Avenue make a rectangle. Limestone Street runs north-south, as does Mason Street to the east. Stanton Avenue runs east-west, as does East Madison Avenue to the north. Within this rectangle, an alley runs east-west and another runs north-south, creating four quadrants. The church sits in the southwest quadrant, and its parking lot abuts all of the east-west alley and a portion of the north-south alley that create that quadrant.

Fields stayed on the floorboard of the passenger seat as she drove.

{¶ 20} Fields and Wright went to Fields's mother's home in Xenia, where they stayed overnight. Wright testified that Fields "made up a story and tried to get me to go over it multiple times just in case we got caught." Wright testified that, about a week after the shooting, Fields confessed to Wright that he had shot Mollett over "the whole issue from Forest Lake." Fields had stated to Wright that he pulled the gun as Mollett ran away. Wright testified that Fields altered the decorations and headlights on his truck after the murder. Wright did not notify the police of the murder or Fields's confession in August 2013.

{¶ 21} Frey testified that he returned the gun to Fields a couple of days after the murder. Kevin Simpson testified that Fields later traded the 9mm gun as part of the purchase of a motorcycle.

*D. Police Investigation*

{¶ 22} Initially, the police did not connect the shooting at the Hoefers' residence on August 2 with the murder of Schuyler Mollett on August 8.

{¶ 23} The police were contacted immediately after the shooting on August 8. At 9:47 p.m., the police received multiple reports of a shooting and spoke with numerous witnesses. Jerry Payton, Jr., who lives on Stanton, testified that he was returning home from the grocery store, when he heard four or five gunshots beside the church at Stanton and Limestone. Payton saw a "dark figure" firing a gun at a 45 degree angle. Payton called 911, and "right after he called," he saw a pickup truck come out of the alley and turn onto Stanton.

{¶ 24} Kelly Hileman testified that she heard six or seven gunshots while in her

bedroom, which was in the back of the second floor of her house on Madison Avenue; the rear of the home faced the alley along the church parking lot. Hileman went to the window and saw a man on the ground. At the same time, she saw someone running in the street with his shirt over his head. Hileman went downstairs to her mother and sister, and went to the back door. At that time, she saw a "revamped" dark blue or black truck go down the alley toward Stanton.

{¶ 25} Tiffany Ogle, who lived with Mollett on Stanton, testified that their backyard faced the alley and church parking lot. On August 8, she and Mollett were watching a movie, when she fell asleep sometime after 8:55 p.m. Ogle remembered that Mollett briefly woke her and said he was going out. When Ogle awoke later, she walked toward the bathroom. Ogle passed her back door on the way to the bathroom and saw police lights. Ogle looked through the window blinds and saw yellow police tape. When she opened the door, she saw Mollett on the ground.

{¶ 26} Amber Brown testified that she lived downstairs from Ogle. On August 8, Brown was looking out the back window, waiting for a friend, when she saw a dark truck with bright orange and red pinstripes and blue headlights coming from Mason Street through the alley. Brown walked away from the window and heard four gunshots followed by two gunshots. Brown went back to the window and saw taillights heading toward Madison Avenue.

{¶ 27} Britney Sloat, who lived at Stanton Avenue and Olive Street, was walking to her car on August 8 when she saw a "frantic" man running without a shirt on. She described the man as 5'6" or 5'7" and slim; Sloat only saw the right side of the man's face. Sloat testified that the man ran across Olive Street to a field where a house had been torn

down. Sloat was provided two photo arrays, one in August 2013 and another in November 2015; Sloat selected an individual each time, but testified that each identification was a "guess." Fields's photo was not included in the first photo array, and it is not clear from the record if his photo was included in the second. Regardless, neither individual that Sloat selected was Fields.

{¶ 28} Numerous police officers responded to the scene of Mollett's shooting and secured it. Mollett was deceased when the police arrived; Dr. Robert Shott of the Montgomery County Coroner's Office testified that Mollett had been shot six times, several of which entered his back, and that Mollett died from the multiple gunshot wounds. Springfield Police Officer Jeff Steinmetz collected five spent 9mm bullet casings from the scene. Analyses by Heather Williams and Joshua Barr of BCI later determined that the cartridges found by Officer Steinmetz were all fired by the same weapon. The following day, Mollett's mother found an additional bullet casing near where her son was shot; that casing was also found to have been fired from the same gun.

{¶ 29} A K-9 unit from the Clark County Sheriff's Office attempted to track the suspected shooter. The police canine tracked the suspect eastward on Stanton for several blocks (past the intersection with Olive), but lost the scent in a park.

{¶ 30} The police investigation faltered. Wright testified that, while intoxicated, she told a friend about the murder sometime around December 2014. In November 2015, Katelyn Dillon, a friend of Mollett, posted a status on Facebook that said "RIP Schuyler. I wish you had justice for you." Dillon received a response to that post, which prompted her to send a threatening Facebook message to Wright.

{¶ 31} Wright testified that after receiving the threatening message from Dillon, she

told her grandmother about the shooting, which led to Wright's talking about the murder with the prosecutor's office in Washington County, Ohio, where Wright was then-residing. On November 6, 2015, Detective Ronald Jordan of the Springfield Police Department (who had taken over responsibility for the cold case) travelled to Washington County to speak to Wright. Wright subsequently entered into a non-prosecution agreement with the Clark County Prosecutor's Office, and she again spoke with Detective Jordan about the murder.

{¶ 32} On November 17, 2015, at Detective Jordan's request, Wright made a recorded telephone call to Fields. Fields subsequently sent Wright several text messages that stated he was "responsible for how you feel and what you feel, and it's my duty to make it go away." On November 20, 2015, Wright made a second phone call to Fields. Fields did not confess the murder in either telephone call.

{¶ 33} Detective Jordan also began to look into the shooting at the Hoefers' residence and the fights at Forest Lake, Wal-Mart, and on Light Street. He asked BCI to compare bullets and cartridges that had been collected from the Hoefers' residence and the scene of Mollett's murder. Joshua Barr of BCI determined that the bullet cartridges found at the murder scene and the bullet jacket found at the Hoefers' home were fired from the same gun.

{¶ 34} On December 2, 2015, Fields was arrested in Xenia. The officers found a shotgun and an assault rifle at his home, but no 9mm handgun. At the time of his arrest, Fields drove a blue GMC Sonoma pickup; the truck did not have striping down the sides.

{¶ 35} Detective Jordan and Officer Steinmetz went to the farm where Fields and his friends liked to shoot weapons. They collected several bullet casings, but none of

those casings matched the weapon that killed Mollett. Jordan tried to locate the seller of the motorcycle in an effort to track down the murder weapon; Jordan discovered that the seller had died. Jordan also looked for the murder weapon from police reports of guns that had "come in off the streets." Jordan learned of a black and green 9mm Kel Tec pistol that had been recovered by the police. That weapon was not connected to any associates of Fields, and ballistic testing revealed that it was not the murder weapon.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 36} Fields's first and second assignments of error claim that his convictions were against the manifest weight of the evidence and based on insufficient evidence.

{¶ 37} A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 38} In contrast, an argument based on the weight of the evidence "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of

the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 39} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 40} On appeal, Fields claims that his convictions for murder, felony murder, and felonious assault were based on insufficient evidence and against the manifest weight of the evidence because of discrepancies in the witnesses' testimony. He emphasizes that the witnesses on August 8 provided inconsistent testimony regarding the clothing of the man who was running and the truck that drove away from the church. Fields also notes that the police dog lost the man's scent in a park (near tire tracks), but Wright's and Frey's testimony indicated that Fields had run home. Fields argues that the only evidence connecting Fields to the murder was Wright's testimony, and Wright admitted during her testimony that she was a liar. Fields states that there was no physical evidence connecting him to the murder, and the police failed to follow-up on several leads.

{¶ 41} Upon review of the evidence as a whole, Fields's convictions for murder, felony murder, and felonious assault were based on sufficient evidence and were not against the manifest weight of the evidence. The State presented substantial evidence regarding Fields's animosity toward Mollett and the Ratchet Clique prior to the murder. As for the night of the murder, several witnesses saw a pickup truck in the alleys and man running eastward from the church shortly after the murder. There were some discrepancies in the witnesses' descriptions, but the witnesses were generally consistent that the man was not wearing a shirt and that the truck was a dark pickup truck; some witnesses noticed the truck's bright headlights and decorations. The testimony was consistent with Wright and Frey's testimony, which indicated that Fields had run home after the murder and that he was not wearing a shirt when he arrived home. Wright also testified that she had driven Fields's blue pickup truck in the alleys after the shooting, and that she sped home after seeing Mollett's body. Wright's testimony about the events of August 8, if believed, expressly connected Fields to the shooting. And, Wright's testimony that Fields had admitted to shooting Mollett as Mollett ran away was consistent with the deputy coroner's findings. The State's evidence was sufficient to support Fields's convictions.

{¶ 42} In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. It was the province of the jury to weigh the evidence and determine whether the State had proven, beyond a reasonable doubt, whether Fields shot and killed Schuyler Mollett on August 8, 2013. The jury heard substantial evidence from which it could have

reasonably concluded that the State had met its burden. We note that defense counsel questioned Detective Jordan about the investigation, and the jury heard about the alleged failure by the police to follow-up on certain leads. Based on the totality of the evidence, we cannot conclude that the jury lost its way in finding Fields guilty of murder, felony murder, and felonious assault.

{¶ 43} Fields next challenges his conviction for tampering with evidence, which was based on Fields's concealment of the gun by giving it to Frey. He argues that Frey's testimony, upon which the conviction was primarily based, was inconsistent and unbelievable.

{¶ 44} R.C. 2921.12(A)(1) provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" The State's evidence, if believed, established that Fields shot Mollett and ran home after the murder. Wright testified that, upon arriving home, Fields said that "we had to get out of town." Frey testified that Fields changed his clothes and then went outside, where Fields told Frey to hold onto his (Fields's) pistol. Frey testified that he put Fields's gun in his trunk. Based on the State's evidence, the jury could have reasonably concluded that Fields was aware that an investigation would begin into the murder of Schuyler Mollett and that Fields gave his gun (the murder weapon) to Frey to conceal it from the police.

{¶ 45} Finally, Fields challenges his conviction for improperly discharging a firearm at or into a habitation. Fields emphasizes that the State's evidence related to the shooting at the Hoefers' residence was similar to that related to the shooting of a church

building (of which he was acquitted), and therefore the jury's guilty verdict with respect to the Hoefers' residence should be overturned.

{¶ 46} In weighing the evidence, the jury must consider each charge separately. The State presented evidence that the same gun fired shots at the Hoefers' residence and was used to kill Mollett. Although no one saw the person who fired shots at the Hoefers' residence, Wright testified that Fields left their residence shortly before the shooting, and when he returned, Fields indicated that he shot at the Hoefers' residence because Wright was "hanging out over there all the time." Fields's conviction for improperly discharging a firearm at or into a habitation was based on the sufficient evidence, and the jury did not lose its way in finding him guilty of that offense.

{¶ 47} Fields's first and second assignments of error are overruled.

### III. Cumulative Errors

{¶ 48} In his third assignment of error, Fields claims that cumulative errors at trial deprived him of a fair trial. Fields states, "In the present matter, errors from the inception of this trial, including hearsay testimony, leading questions, and allowing the State to present recorded telephone conversations that were not properly authenticated, deprived the Appellant of a fair trial."

{¶ 49} The cumulative error doctrine provides that a conviction may be reversed "where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial[,] even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995); *see State v. Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366, ¶ 129. Fields's first and second assignments of error challenged only the weight

and sufficiency of the evidence. His single statement here alluding to multiple evidentiary errors is not sufficient to raise those additional matters for appeal. Consequently, Fields has not demonstrated that multiple errors occurred.

**{¶ 50}** Fields's third assignment of error is overruled.

### IV. Conclusion

**{¶ 51}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

Andrew P. Pickering
Mark Wieczorek
Brian Joslyn
Hon. Douglas M. Rastatter