[Cite as *State v. Piersoll*, 2020-Ohio-514.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

STATE OF OHIO                              :
                                           :
    Plaintiff-Appellee             :     Appellate Case No. 2019-CA-38
                                           :
v.                                         :     Trial Court Case No. 2019-CR-120
                                           :
ANDRE PIERSOLL                             :     (Criminal Appeal from
                                           :      Common Pleas Court)
    Defendant-Appellant            :
                                           :

. . . . . . . . . . .

O P I N I O N

Rendered on the 14th day of February, 2020.

. . . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, OH 45502
    Attorney for Plaintiff-Appellee

ANDREW SCHLUETER, Atty. Reg. No. 0086701, P.O. Box 96, Xenia, Ohio 45385
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Andre Piersoll was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1), a first-degree felony, after a jury trial in the Clark County Court of Common Pleas. The trial court sentenced Piersoll to ten years in prison. Piersoll appeals, claiming that his conviction was against the manifest weight of the evidence. For the following reasons, the trial court's judgment will be affirmed.

{¶ 2} When reviewing an argument challenging the weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 3} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *State v. Ford*, Ohio Slip Opinion No. 2019-Ohio-4539, __ N.E.3d __, ¶ 340; *Thompkins* at 387.

{¶ 4} At trial, the State presented five witnesses; Piersoll offered no witnesses on his own behalf. The State's evidence at trial court established the following facts.

{¶ 5} On February 7, 2019, William Harper lived with his wife, Melissa, and father-in-law, George Frost, on Sturgeon Street in Clark County.   At approximately 9:30 p.m. that evening, while Harper was watching television, a man they did not know (later identified as Piersoll) knocked on their front door.   When Harper answered the door, Piersoll came inside and said that he was "looking for the guy that killed his friend" and wanted to kill him.   Harper did not know who Piersoll was referring to, and he told Piersoll that he did not know who Piersoll was looking for.   Harper suggested to Piersoll that he might want to ask his (Harper's) neighbors for information.   Piersoll left the residence. Harper locked the door behind him.

{¶ 6} About 15 minutes later, Piersoll returned to Harper's residence and began "pounding" on the front door "real loud"; Harper emphasized that the knocking was "forceful" and "not like a regular knock."   Harper testified that he was in the back room and could hear Piersoll saying, "Let me in.   Let me in."   Harper did not answer the door and, instead, called 911.   (The recording of Harper's 911 call was not admitted, but the recordings of two other 911 calls made by unidentified neighbors were admitted into evidence as State's Exhibits 2 and 3.)

{¶ 7} Harper called to Piersoll to go away, but Piersoll continued to pound and kick at the front door.   Ultimately, Piersoll kicked in the front door and entered the home. Photographs taken of the front door after the incident showed that the bottom panel of the door was separated from the door and pieces of the door frame and wood door were strewn across the floor inside the home.

{¶ 8} Harper described the scene upon Piersoll's entry as "chaotic."   He testified that everyone in the house was screaming, and they told Piersoll to get out.   Harper also

got his father-in-law, who was frightened, into his wheelchair and out of the living room. Within a few minutes, Harper's neighbor came over and the police arrived. When asked on redirect examination what Piersoll was doing between the time he kicked in the door and the police officers' arrival, Harper testified:

> You know, I'm not too sure. I think he was trying to get our phone. He wanted to use our – I remember him saying he wanted to use our phone and he kept grabbing at my wife's phone. I remember that. So there was a lot of pushing and shoving going on. My father-in-law got pushed in the wheelchair a few times. It was just kind of chaotic there for a few minutes.

Tr. at 114. Harper stated that he was not assaulted, but his father-in-law was assaulted. Tr. at 116. Harper testified that Piersoll took his wife's phone out of her hand and used it to call his (Piersoll's) mother.

{¶ 9} Frost, Harper's father-in-law, also testified about the February 9 incident. He described the incident as follows:

> Somebody kept beating on my door, beating like a wild person. And finally Bill [Harper], he was in the back room, he [Harper] come running around and opened the door and he [Piersoll] shoved Bill out of the way and come on in.

> He [Piersoll] asked us, "Who's the guy got killed here?" "Nobody got killed here," we told him and he kept arguing. We told him he had to go, he had to go. Bill tried to push him. And I went up there and pushed on his legs and he sort of pushed me back and, you know, knocked me up there.

Finally, Bill got him to go outside and I said, "Close the door and lock it real tight." And he [Harper] closed the door and locked it and then Bill said he'd [Piersoll] come over next door now. He [Harper] was looking out the window, I guess.

And then he went over there and he come back and the guy that followed him back over there. And he [Piersoll] started beating on my door again and he said, "Let me in, let me in." He said, "I'm going to kill that guy."

And he stopped for a second, beating, then he started kicking. He kicked the whole, my door clear in half, just the door kicked out, kicked it in half. And it hit me on the legs and splintered, cut me there (indicating) and cut me down here. But it wasn't a deep, you know, it was more of a scrape cut. Not a stabbing or cut or nothing, but I still got it though.

Tr. at 121-122. Frost stated that he asked Harper to get him (Frost) out of the house and to his (Frost's) truck. Frost stated that he was in the truck when the police arrived.

{¶ 10} On cross-examination, Frost stated that he was "totally blind" and acknowledged that he did not see Harper's actions. Frost disagreed that they had sent Piersoll to their neighbor's residence; he indicated that they had just gotten Piersoll out of the house. Frost testified that Piersoll returned after approximately two minutes, at which time Piersoll started "beating on" and then kicking the front door. Frost reiterated that he received splinters when Piersoll kicked in the door.

{¶ 11} Springfield Police Officers John Lish and Meredith Freeman responded to a dispatch regarding disorderly conduct at Frost's and Harper's residence. The dispatch

reported that there was a male inside the house that had kicked in the door. The officers encountered Piersoll, who was walking out the front door. Officer Freeman described the scene as "very loud. Everyone was yelling different things. Bits and pieces that I could gather there was someone in the house that wasn't welcome." Tr. at 143.

{¶ 12} Both officers testified that Piersoll repeatedly put his hands in his pockets, despite the officers' requests to take his hands out of his pockets. Piersoll eventually said that he had a beer, and he removed the beer from a pocket, which the officers took and set down. Piersoll again put his hands in his pockets.

{¶ 13} Officer Freeman told Piersoll that they (the officers) were going to detain him so they could figure out what was going on. Freeman instructed Piersoll to put his hands behind his back. The officers then grabbed Piersoll's arm and wrist, but Piersoll pulled away and ran into the front yard. The officers again "got ahold of him" and Officer Lish deployed his Taser, but the Taser did not work properly and Piersoll ran westward down Sturgeon Street. The officers ran after Piersoll and Lish deployed his Taser again. This time, the Taser worked, and Lish was able to apprehend Piersoll.

{¶ 14} After taking Piersoll into custody, the officers returned to the residence. Officer Lish took photographs of house number and the front door of Harper's and Frost's residence. Officer Freeman spoke with the residents and took their statements. On cross-examination, Freeman indicated that her report contained no information about someone's taking someone else's phone. Freeman stated that Frost had advised her that he was pushed across the room in his wheelchair and that he might have bumped his knee, but she did not recall seeing any visible injury. Freeman stated that her case report indicated that no injuries were reported.

{¶ 15} On redirect examination, Officer Freeman stated that her report included information that Piersoll had said to the residents inside the residence that he would leave if they allowed him to call his mother on their cell phone, and that the residents did.

{¶ 16} After closing arguments, during which the parties focused on the second encounter, the trial court instructed the jury on aggravated burglary (as charged), in violation of R.C. 2911.11(A)(1), and trespass in a habitation when a person is present or likely to be present, in violation of R.C. 2911.12(B), a lesser-included offense. The jury found Piersoll guilty of aggravated burglary.

{¶ 17} R.C. 2911.11(A)(1), the aggravated burglary statute, provides:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another[.]

"Physical harm to persons" is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 18} Piersoll claims that the State's evidence failed to support two elements: (1) that he acted with purpose to commit in the structure any criminal offense, and (2) that he inflicted or attempted or threatened to inflict physical harm on another. Piersoll acknowledges that he threatened to kill the person that killed his friend when he first came

to the house, but he asserts that he lacked the same intent when he returned. With respect to the physical-harm element, Piersoll states that the threats of physical harm were made to an unknown individual who was not present at the residence and that Frost's testimony that he incurred an actual physical injury was not credible.

{¶ 19} In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. It was the province of the jury, as the trier of fact, to weigh the evidence and determine whether the State had proven, beyond a reasonable doubt, that Piersoll had committed aggravated burglary, trespass in a habitation, or neither of those. *See State v. Ball*, 2d Dist. Clark No. 2017-CA-54, 2018-Ohio-605, ¶ 27.

{¶ 20} Upon review of the evidence at trial, the jury reasonably concluded that the State proved each element of aggravated burglary. Both Harper and Frost testified that Piersoll forcibly entered their residence without permission. They testified that, the second time Piersoll came, he kicked in the front door and pushed his way in. Photographs of the front door corroborated the extensive damage to the front door.

{¶ 21} According to Harper's testimony, when Piersoll first came to the house, Piersoll stated that he was looking for the person who killed his friend. Harper testified, and Piersoll acknowledges in his appellate brief, that Piersoll threatened to kill that person. Harper initially testified that there was "no conversation" when Piersoll returned, and the conversation Harper later described concerned Piersoll's use of Harper's wife's cell phone. However, Frost testified that, when Piersoll returned to the house, he demanded to be let in and said, "I'm going to kill that guy." Tr. at 124. Although Harper's

and Frost's testimony differed as to whether Piersoll orally expressed a desire to kill someone when he returned to the house, the jury could have reasonably concluded, based on Frost's testimony as well as Piersoll's conduct, that Piersoll continued to believe that the person he was looking for was in Frost's and Harper's residence and that he (Piersoll) kicked in the front door and entered with the purpose to commit an assault inside the home.

{¶ 22} With respect to physical harm, Frost testified that he was cut by pieces of the wood front door when Piersoll kicked in the door.  Frost stated that he sustained injuries to his hands, feet, and legs, some of which had not completely healed by the trial date.  Although Officer Freeman testified that no one had reported any injury and Officer Lish took photographs only of the damaged door, it was the role of the jury to determine whether Frost's testimony regarding the cuts to his legs and other injuries was credible. The jury could have reasonably concluded that Piersoll caused some injury, albeit minor, to Frost.

{¶ 23} We cannot conclude that this case presents an exceptional circumstance where the jury "clearly lost its way" and its guilty verdict was against the manifest weight of the evidence.   Piersoll's assignment of error is overruled.

{¶ 24} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

WELBAUM, P.J. and DONOVAN, J., concur.

Copies sent to:

John M. Lintz
Andrew Schlueter
Hon. Douglas M. Rastatter