[Cite as *Dayton v. Burke*, 2020-Ohio-4589.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| CITY OF DAYTON | : | |
| | : | Appellate Case No. 28584 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2019-CRB-1569 |
| v. | : | |
| | : | (Criminal Appeal from |
| BRANDON BURKE | : | Municipal Court) |
| | : | |
| Defendant-Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 25th day of September, 2020.

. . . . . . . . . .

JORDAN L. BLAKE, Atty. Reg. No. 0099050, City of Dayton Prosecutor's Office, 335 West Third Street, Room 372, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

JOHN S. PINARD, Atty. Reg. No. 0085567, 120 West Second Street, Suite 603, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} After a bench trial in the Dayton Municipal Court,[1] Brandon Burke was found guilty of failure to control dogs, in violation of Dayton Revised Code of General Ordinances ("R.C.G.O."), Section 91.50(A)(5), a first-degree misdemeanor. The trial court sentenced Burke to 180 days in jail, all of which were suspended, and placed him on probation for one year. The trial court also ordered him to pay restitution of $107.80, a $50 fine, and $120 in court costs.[2] Burke appeals from his conviction, claiming that his conviction was against the manifest weight of the evidence. For the following reasons, the trial court's judgment will be affirmed.

{¶ 2} A weight-of-the-evidence argument "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Jones*, 2d Dist. Montgomery No. 28179, 2019-Ohio-2940, ¶ 13, quoting *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact, but reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must

---

[1] The trial court's judgment entry incorrectly states that Burke entered a guilty plea.

[2] The trial court's online docket reflects that Burke has paid his financial obligations in full and that his probation has been discharged. Although the voluntary completion of a misdemeanor sentence may render an appeal moot, we conclude that R.C.G.O. 91.50(C) creates a statutory collateral consequence for those convicted of violating R.C.G.O. 91.50(A)(5). Stated generally, R.C.G.O. 91.50(C) prohibits a person convicted of violating R.C.G.O. 91.50(A)(5) from possessing a dog for five years from the date of conviction.

be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 3}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 4}** On April 2, 2019, a dog went onto the front yard of Donald King's home on East Fourth Street and killed King's approximately ten-year-old cat, Buddy. The primary issue at trial was whether Burke was responsible for the dog. The City's evidence at trial established the following facts.

**{¶ 5}** Samantha Vollsky lived across the street from King, and she had lived there for at least six years. On April 2, Vollsky heard her two dogs, which were in her fenced front yard, "causing a commotion," which was unusual. When she went outside to check on them, she saw "some gentleman freaking out" and a dog on King's porch. Vollsky telephoned King to tell him there was a dog on his front porch. Vollsky testified that she did not know the man who was outside and she did not recognize the dog. Vollsky stated that King owned dogs and cats, but he did not own a dog that looked like the dog on the porch. Vollsky did not see a leash on the dog.

**{¶ 6}** King came outside immediately and saw his cat. Vollsky testified that Burke,

whom she identified at trial, came from around the corner on South Hedges Street (a few houses away), went straight to King's porch, and retrieved the dog. Vollsky heard King yell at Burke that "your dog killed my cat." Burke apologized, saying "I'm so sorry." Vollsky also heard Burke yell at the dog, saying something like "I can't believe you did this." Vollsky testified that Burke took the dog back toward Hedges Street. Vollsky saw a woman standing at the corner of Fourth and Hedges, watching.

{¶ 7} King testified that he had gotten back from the store and was getting Buddy's dinner ready when he received a telephone call from Vollsky, who told him that she thought a dog had just killed his cat. King stated that he ran outside and saw the dog standing over his cat at the bottom of the porch steps. King said the dog had a collar but was not on a leash. King yelled at the dog. King testified that Burke ran up from around the corner on Hedges and grabbed the dog by the collar. When King yelled at Burke that "his f*cking dog killed my cat," Burke apologized. King testified that Burke said that he was walking his dog and it had gotten off the leash; King did not notice a leash. King saw Burke pull the dog back toward Hedges Street.

{¶ 8} On cross-examination, defense counsel asked King if Burke ever made a statement that the dog was his. King responded, "No. He never made a statement. But I couldn't imagine anyone running up to a dog they didn't know, grab a hold of it and start pulling and cussing at it." King did not see what happened to the dog after Burke took the dog up Hedges Street.

{¶ 9} Burke testified at trial and called Faith Lilly to testify on his behalf.

{¶ 10} Lilly testified that she lived on South Hedges Street, about four houses from the intersection with East Fourth Street. On April 2, 2019, she was outside at her home

when she heard a gentleman calling for help. Lilly went to the corner of Hedges and Fourth Streets and saw a man with a cane or broom yelling about a dog.[3] Lilly ran back to her house and called for Burke, who lived across the street from her and was outside. Lilly testified that Burke "ran down back with me and he [Burke] was able to go up and get the dog." Lilly stated that King was screaming that he was going to kill Burke and the dog. Lilly testified that she heard Burke say, "That's not my dog."

{¶ 11} Lilly stated that she had assumed the dog was Burke's because she knew he had a black dog of the same breed. (Lilly testified that she also had a black dog of the same breed, but hers was in her yard and was taller.) She indicated that, after Burke retrieved the dog, he told King that he would try to find the dog's owner. Lilly testified that Burke started walking "the other way" from his home with the dog, and she went home.

{¶ 12} Burke testified that he owned property on South Hedges Street but was not actively living there on April 2, 2019, due to a housing complaint. Burke stated that he had pets until the end of February 2019, and that he had to give them up due to the housing complaint.

{¶ 13} Burke testified that, on April 2, he was at the Hedges residence, working on his motorcycle in the garage; he did not have any animals at the residence. While he was working, he heard Lilly screaming about a dog killing cats. Burke stated that he ran over to King's residence and grabbed the dog.

{¶ 14} Burke testified that he told King that he was sorry that his (King's) cat was dead, but that the dog was not his. Burke said that he told King that he (Burke) was

---

[3] Lilly's subsequent testimony suggests that this man was King, but it is not clear.

going to take the dog, put it on a rope and chain, and see if he could find the owner. Burke said that he left when King threatened to kill him and the dog. Burke took the dog "down the alley" and chained it in his garage.

{¶ 15} Burke testified that he had seen the dog loose before, and the owner came around 10 to 15 minutes later, calling for a dog named Curley. Burke told the owner what had happened and who to talk to. Burke stated that the owner put the dog on a leash and took it back down the alley. Burke testified that he did not get the owner's name or phone number.

{¶ 16} On cross-examination, Burke acknowledged that he had had a dog of the breed at issue. Burke stated that his dog had been brown, not black.

{¶ 17} Burke was convicted of violating R.C.G.O. 91.50(A)(5), which, in April 2019, provided: "No person owning, keeping, possessing, harboring, maintaining, or having the care, custody, or control of a dog shall suffer or permit such dog to: * * * Bite or otherwise cause physical harm to any other person, domestic animal, or feline." [4] Burke acknowledges on appeal that the dog caused physical harm to a feline. He asserts, however, that the manifest weight of the evidence demonstrates that he did not own, keep, possess, harbor, maintain, or have care, custody, or control of the dog that killed King's cat.

{¶ 18} Upon review of the evidence, we cannot conclude that the trial court "lost its way" when it found Burke guilty of violating R.C.G.O. 91.50(A)(5). In reaching its verdict, the trial court, as the trier of fact, was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence

---

[4] R.C.G.O. 91.50 was amended effective February 12, 2020.

presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. It was the province of the trier of fact to weigh the evidence and determine whether the State had proven, beyond a reasonable doubt, that Burke violated R.C.G.O. 91.50(A)(5).

{¶ 19} In this case, the trial court reasonably concluded that Burke was the owner of the dog that killed King's cat, Buddy. Burke acknowledged that he had owned a dog of the same breed that killed Buddy, and Lilly testified that Burke had owned a black dog that looked like the dog at issue. On April 2, Lilly had believed that the dog belonged to Burke. Both King and Vollsky testified that they saw Burke run up to King's yard, grab the dog, and apologize to King. Burke's conduct, along with Vollsky's testimony that Burke yelled at the dog "I can't believe you did this," strongly suggested that the dog was Burke's.

{¶ 20} We recognize that Burke presented evidence that he did not own the dog. Lilly testified that she heard Burke say to King that the dog was not his and that he would try to find the owner. Burke also denied that the dog was his. He expressly stated that his dog had been a different color (brown, rather than black) and that he no longer had the dog after February 2019. Burke did not have a leash when he grabbed the dog from King's home. Although the trial court heard evidence from which it could have concluded that the dog was not Burke's, this is not the exceptional case in which we can conclude that Burke's conviction was against the manifest weight of the evidence.

{¶ 21} Burke's assignment of error is overruled.

{¶ 22} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.


Copies sent to:

Jordan L. Blake
John S. Pinard
Hon. Christopher D. Roberts