[Cite as *State v. Silcott*, 2018-Ohio-3507.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-12 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-170 |
| | : | |
| CHRISTOPHER A. SILCOTT | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 31st day of August, 2018.

. . . . . . . . . . .

DEBORAH S. QUIGLEY, Atty. Reg. No. 0055455, Assistant Prosecuting Attorney, Darke County Prosecutor's Office, 504 South Broadway Street, Greenville, Ohio 45331
    Attorney for Plaintiff-Appellee

DANIEL F. GETTY, Atty. Reg. No. 0074341, 46 East Franklin Street, Centerville, Ohio 45459
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1}  This matter is before the Court on the November 2, 2017 Notice of Appeal of Christopher A. Silcott.   Silcott appeals from his October 18, 2017 Judgment Entry of Conviction, issued following a bench trial, on one count of aggravated trafficking in drugs, in violation of R.C. 2925.03(A)(1),(C)(1)(c), with a specification of prior convictions, a felony of the third degree (Count I); one count of aggravated possession of drugs, in violation of R.C. 2925.11(A),(C)(1)(c), a felony of the second degree (Count II); one count of possessing criminal tools, in violation of R.C. 2923.24(A), a felony of the fifth degree (Count III); and one count of having weapons while under disability, in violation of R.C. 2923.13(A)(3), a felony of the third degree (Count IV). The court sentenced Silcott to a mandatory term of 30 months for aggravated trafficking in drugs, to a mandatory term of five years for aggravated possession of drugs, to 116 days for possession of criminal tools, and to 30 months for having weapons while under disability.   The court ordered that the sentences for aggravated trafficking in drugs and having weapons while under disability be served consecutively to each other and concurrent to the remaining counts, for a total sentence of 5 years.   The court imposed a $5,000 mandatory fine for aggravated trafficking in drugs and a $7,500 mandatory fine for aggravated possession of drugs, as well a three-year period of mandatory post release control.   We hereby affirm the judgment of the trial court.

{¶ 2} Silcott was originally charged by way of complaint with one count of aggravated trafficking in drugs on July 25, 2017.   On July 28, 2017, Silcott was indicted on one count each of aggravated trafficking in drugs, aggravated possession of drugs, possession of criminal tools, and having weapons while under disability.   Silcott was

arraigned and pled not guilty on August 4, 2017. On October 13, 2017, Silcott filed a "Withdraw of Jury Demand."

{¶ 3} At the start of his October 18, 2017 trial, the prosecutor indicated that Count II of the indictment provided that the amount of the drug involved equaled or exceeded the bulk amount but was less than five times the bulk amount, but that it "should have said that it was more than five times bulk amount but less than 50 times the bulk amount." The prosecutor asked to amend the indictment, defense counsel objected, and the court deferred ruling on the request.

{¶ 4} Jamie Hampshire testified that in April 2017, she resided with Silcott in Gettysburg in Darke County, Ohio. Hampshire testified that she agreed to testify pursuant to a plea agreement, namely that the State "will drop the F2 to an F3 for me to testify against him and drop the F5." Hampshire stated that she met Silcott in January 2017 through a mutual friend, and that "she actually went and bought drugs off of him." She stated that in February 2017, she and her husband "split up," and that she and Silcott then began a relationship. According to Hampshire, "we were supposed to make things better, our lives better, but it ended up worse." Hampshire stated that she began using methamphetamine "[w]hen I woke up" every day at the end of January or beginning of February, 2017. Hampshire stated that she obtained the drugs from Silcott, and that Silcott supported them both with drug money and "garage sale stuff." She stated that Silcott paid the first three months' rent on their apartment. According to Hampshire, Silcott sold methamphetamine that he obtained in the Dayton area every day.

{¶ 5} Hampshire testified that, on July 24, 2017, Tim H. came to their apartment around 9:30 a.m. as she and Silcott were getting into bed, having been up all night using

drugs. Hampshire testified that "when I was in the bedroom because I stayed in the bedroom a lot and [Tim H.] came over and he came in the bedroom and Chris gave him some stuff, meth. They talked and then he - - that was it. He left." According to Hampshire, she and Silcott went to sleep, and the police later arrived, woke them up, and arrested them. She identified photos of the apartment she shared with Silcott. Hampshire testified that State's Exhibit 4 depicted a phone, a ledger book, and Silcott's gun on the living room sofa. Regarding the ledger book, Hampshire stated that "when people bought stuff, garage sale stuff and everything, he had a name in it, their names and what they owed." Hampshire stated that State's Exhibit 5 depicted a pipe and a "torch" to light it, and that State's Exhibit 6, taken from a different angle, depicted two pipes. Hampshire testified that State's Exhibit 7 depicted scales that were used to weigh methamphetamine, as well as a close-up of the "torch." Hampshire stated that the living room, where the above photos were taken, led into the bedroom. She stated that State's Exhibit 12 depicted Silcott's nightstand, including a book bag with plastic bags on top for Silcott's "jewelry and drugs." Hampshire stated that she was aware that methamphetamine was present in her residence "almost every day."

{¶ 6} On cross-examination, Hampshire testified that she and Silcott both signed the lease for the apartment. She testified that Silcott got the gun the night before his arrest from "a couple friends of his that came over." She stated that Tim H. brought over the scales, pipes and baggies "a few days prior," and that they were not there until Tim H. brought them. On re-direct, when asked how Silcott sold methamphetamine before Tim H. brought him the scales, she replied that Silcott had a different set of scales and other baggies. She stated that she thought someone stole the other scales. Hampshire

stated that in addition to Silcott going to Dayton to obtain methamphetamine, people also brought the drug to him in Gettysburg.

{¶ 7} Eric Hanes testified that he was a narcotics detective with the Darke County Sheriff's Office, having been so employed for over 22 years. He stated that Tim H. was a confidential informant with whom he worked on July 24, 2017, to make a controlled buy from Silcott. He stated that Tim H. "had previously contacted * * * Detective Clark and explained to him that he had some information that might help him out. * * * And we ended up using him as a confidential informant to make a controlled purchase of drugs from Chris Silcott." Hanes stated that, on July 24, 2017, Tim H. "had made contact with Sergeant Clark [and] advised that he could make a controlled buy off of Chris Silcott." Hanes stated that prior to the buy, Tim H. was searched for money, drugs, and contraband and then transported to the area of the buy and provided with currency to make the purchase; Tim H. was also given a recording device.

{¶ 8} Detective Hanes stated that he observed Tim H. approach and enter Silcott's residence. He stated that he was able to view and listen to the transaction on his cell phone by means of Tim H.'s recording device, and that he "could hear a transaction taking place." He stated that he heard Tim H.'s voice as well as Silcott's. Hanes stated that, when the transaction was complete, he observed Tim H. exit the apartment building and walk directly to him. Hanes stated that he "never lost site [sic] of him. He walked directly past me because as he was walking by me I said, just keep walking back to the car where it was parked so I could make sure that nobody was out following him or anything like that because that's a common practice." Hanes stated that Tim H. "got in the vehicle with Sergeant Clark." Hanes subsequently got into Clark's vehicle as well and "went back to

the Sheriff's Office with the evidence in hand from the purchase of the narcotics."

{¶ 9} Hanes stated that Clark field-tested the substance, that it "tested positive for methamphetamine," and that he "went back to do surveillance on the residence while Sergeant Clark set up the next portion of the search warrant and raid for the house." Hanes remained at the residence for several hours and, throughout the day, "there [were] multiple people coming and going from the residence." Hanes stated that after the search warrant was executed, he proceeded to the residence and "processed the scene inside by taking pictures * * * and collecting evidence."

{¶ 10} Hanes identified the photos taken at the residence by him about which Hampshire testified. He identified State's Exhibits 16, 17 and 18 as depicting items found in the course of executing the search warrant, which included photos of three baggies filled with methamphetamine, pipes, plastic baggies "that are used for selling narcotics," "the handgun with the ammunition that he had for the handgun, the digital scale, the phone * * * he used to make transactions and deals," as well as the "money that was seized during the search warrant, marijuana, the meth, some plastic baggies," and a "torch." Hanes stated that digital scales "are generally used by drug dealers to weigh out the product which they're selling. They weigh it out to know what price to sell it for."

{¶ 11} Hanes stated that he read Silcott his rights at 10:00 a.m., and that Silcott agreed to speak to him. Hanes identified State's Exhibit 19 as the statement of *Miranda* rights signed by Silcott. Hanes testified that Silcott told him he wanted "to try to work a plea deal and be an informant," and that "he had been selling drugs for a long time by getting drugs down in the Dayton area from certain individuals." Hanes stated that he

again advised Silcott of his rights the following day and "just continued the conversation from the day before." He identified State's Exhibit 20 as Silcott's second statement of *Miranda* rights. Hanes stated that Silcott was in custody at the Darke County Sheriff's Office when questioned. Hanes stated that Silcott told him "that the red ledger book was people that owed him money for drugs." Hanes stated that Silcott "gave up several different names down in the Dayton area that he was able to go down and purchase from. He was advising that the reason why heroin was slowing down is because they're flooding our area and other areas with methamphetamine for prices that were really low." Hanes stated that Silcott told him that he sold drugs "[t]o make money," and that "it was good money."

{¶ 12} At the conclusion of Hanes's testimony, the following exchange occurred:

THE COURT: Did you record your interviews on the 25th and 26th with Mr. Silcott?

THE WITNESS: Yes, I did.

THE COURT: Were there transcripts prepared or summaries made?

THE WITNESS: There's a summary of the interview, yes.

THE COURT: Each of them?

THE WITNESS: Yes.

THE COURT: Provided to the defense, Mrs. Quigley?

MS. QUIGLEY: Yes.

THE COURT: Any objection that I might have those?

MR. PIERRON: I have none, your Honor.

MS. QUIGLEY:   No.

THE COURT:   And the reason for that, for the record, is there's a lot of discussion that people's memories logically move over time.

* * *

THE COURT:   And the best record of what was said would be something written more closely in time as opposed to what we think we remember many months later after we restudy and rethink and reprocess.

* * *

THE COURT:   So that's an evolving area of the law. * * * No characterization of credibility implied.

* * *

MS. QUIGLEY:   The State has provided the Court with a copy of the notes of Detective Hanes - -

* * *

THE COURT:   I'll mark these as Court's Exhibit 1.

{¶ 13}   Tim H. testified that he was incarcerated at the time of the trial, and that he used to reside at the Towne House Motel in Greenville.  He stated that he met Silcott during the previous winter, and after they became friends Tim H. would see Silcott "probably daily."  He stated that he used to see Silcott in Greenville, but "when he got his place in Gettysburg is when I started to see him in Gettysburg."  Tim H. stated that he knew Hampshire, and that she and Silcott "were a couple."  He stated that he and Silcott used crystal meth and marijuana together, and that he got methamphetamine from Silcott. Tim H. stated that he "started to work with the Darke County Sheriff's Office * * * a couple

weeks prior to the day that I met up with the detectives to take in a tool to get video and audio of buying from Chris." Tim H. stated that he got caught selling methamphetamine, and that the sheriff's office approached him about becoming an informant in exchange for the dismissal of his charges. Tim H. stated that he agreed to do so, and he set up the controlled buy. Tim H. stated that he met with detectives "Hawes" and Clark in Gettysburg and that he "was patted down, make sure there was nothing on [sic] my possession." He stated that he "was given a tool that was used for video and audio. I took the tool for video and audio, [and] went straight to Chris Silcott." Tim H. stated that he "met up with Chris, [and] gave him the money that I owed him * * *." According to Tim H., Silcott would give him "ice," methamphetamine, and crystal meth "to get rid of and bring him back money." Tim H. stated that he was "broke all the time and I would be fronted and I would go out and make money. * * * I have a couple of people I talked to, made some money and just did it over and over again daily mostly."

{¶ 14} Tim H. stated that, in the course of the controlled buy, he took three or four hundred dollars to Silcott and "walked out with * * * between seven and ten grams" of methamphetamine. After the buy, Tim H. stated that he "walked back to the detectives, met with the detectives right away, and they patted me down and took the drugs off me and put it in their possession." When asked if anything was promised to him in exchange for his testimony, Tim H. responded, "what I got in trouble for is what was promised to me to be thrown out." Tim H. indicated that he had been charged with drug trafficking, and that he has a prior felony conviction from 2007 for trafficking in marijuana.

{¶ 15} Detective Sergeant Christopher Clark testified that he was employed at the Darke County Sheriff's Office, having been so employed for 15 years. He stated that he

had been doing narcotics investigations for seven years. When asked how he selected confidential informants, he responded as follows:

We gather a lot of Intel at the Sheriff's Office. Detective Hanes and myself, we do a lot of interviews. So when I'm asking a person I might be wanting to be an informant, I ask them questions about what's going on in Greenville or in Darke County. And I can tell if they're lying to me or not about certain people and everything. I judge off of their character if they're telling me the truth.

{¶ 16} Clark stated Tim H. agreed to become an informant after detectives "did a drug buy on Water Street * * *. He was inside the residence when we did the search warrant on the house and in his front pocket he had methamphetamine. So he was charged with possession of methamphetamine." Clark stated that he, Hanes, and "Detective Marion, we all knew that [Tim H.] was friends with Chris Silcott * * * and we met [Tim H.] and we talked about Chris Silcott, his involvement, what he's doing." Clark stated that he advised Tim H. that if he agreed to purchase methamphetamine from Silcott in a controlled buy, the charge against Tim H. would not be turned over to the prosecutor.

{¶ 17} Clark's testimony was consistent with Hanes's about the procedures used in the controlled buy. Clark testified that, while sitting in his vehicle, he was able to "watch the audio/video of the transaction as it's going on. * * * Detective Hanes was up by the gas station and he was keeping eyes on [Tim H.] as he went into the residence and as he came back." A copy of State's Exhibit 24, the audio/video of the controlled buy, was played for the court.

{¶ 18} Clark identified State's Exhibit 21 as a photo of the "buy money" provided

to Tim H., and State's Exhibit 22, which depicted two pouches and a package of baggies, as "what [Tim H.] brought back to me." According to Clark, when Tim H. entered the residence, "he did not have the bag with him. But when he returned, he had the bag with him and the methamphetamine was in it along with the small bags that you would use to put methamphetamine in to sell." Clark identified State's Exhibit 23 as a photo of "a field test I did of the methamphetamine and it field tested positive. This was the methamphetamine that [Tim H.] purchased from Mr. Silcott." Clark stated that after he confirmed that the substance was methamphetamine, "we went into getting a search warrant for the residence." Clark identified Exhibit 25 as a copy of the search warrant he obtained.

{¶ 19} Clark stated that, after obtaining the warrant, he met with "the Special Response Team. We knew that there possibly was a weapon inside the residence. So I had the Special Response Team handle going there and making contact with Mr. Silcott and Jamie Hampshire." Clark stated that in the course of the execution of the warrant, "Mr. Silcott and Miss Hampshire, they were called out on a PA to come out of the residence. They came out with no problems." After the residence was secured, Clark stated that he and Hanes went upstairs. Clark identified State's Exhibits 17 and 18. He identified State's Exhibits 26-37 as evidence bags containing the evidence he processed. Clark stated that a High Point Firearms, model JCP 40, Smith and Wesson was removed from the scene, and that when it was found, "the magazine was inserted in it and it had live ammunition inside the magazine." He stated that he tested the weapon, and it was operable.

{¶ 20} Clark stated that he had known Silcott for seven or eight years. He

identified as State's Exhibit 38 a certified judgment entry of Silcott's prior conviction in Case No. 2011 CR 00043. The judgment reflected that Silcott had been charged with illegal manufacture of drugs and illegal assembly or possession of chemicals for manufacture of drugs, but he pled guilty to one count of attempted illegal manufacture of drugs (methamphetamine) (Count I), a felony of the second degree, and one count of illegal assembly or possession of chemicals for manufacture of drugs (Schedule II) (Count II), a felony of the third degree. Silcott was sentenced to five years on Count I and three years on Count II, to be served concurrently. Finally, Clark identified State's Exhibits 39 and 40 as Laboratory Reports from the Miami Valley Regional Crime Laboratory confirming that the evidence submitted from the controlled buy was methamphetamine and its weight. Exhibit 39 provides that testing revealed methamphetamine "having a net weight of 17.23 grams, +/- 0.08 gram(s)" and that the "bulk amount of Methamphetamine is three (3.00) grams." Exhibit 40 provides that testing revealed methamphetamine "having a net weight of 6.92 grams, +/- .02 gram(s)."

{¶ 21} The following exchange occurred during Clark's cross-examination:

Q.   * * * And just so I'm clear, the controlled buy was the basis for the search warrant, correct?

A.   Correct.

Q.   * * * I have an affidavit here that was provided in discovery July 25th, 2017, and it basically says that you were in contact - - you signed it so I'm just going to ask you.   That you were in contact with a confidential and reliable informant hereafter referred to as [Tim H.].   * * *

A. Correct.

Q.   It says, This officer knows [Tim H.] to be reliable and that he or she has provided information in the past that has been confirmed to be true and accurate.   What does that mean?

A.   When we were talking to him at the Greenville Police Department, the information that he was giving, we didn't have to ask.   We didn't have to guide him in any direction.   Stuff that he was actually saying we knew to be true.   We knew that he was being a truthful person to us.

Q.   Okay.

A.   He wasn't trying to lie to us.   He wasn't trying to make a story up.

* * *

Q.   * * * So how many times do you think he supplied you reliable information based on your experience with him?

A.   Based on my experience with him, I could - - any time he would talk about Mr. Silcott, how he was talking in that interview at Greenville Police Department.   I don't know how many different accounts that we knew that he was telling the truth about.

Q.   May I ask what kinds of things he was getting right, I guess - -

A.   Just drug activity, his pattern.   I've interviewed other - - * * * drug users * * * in my interviews, and Mr. Silcott's name comes up.   So I could tell about the guns that we'd gotten information on before in the past that he had guns with [Tim H.] bringing that up.

Q. * * * Has [Tim H.'s] information led to a conviction or any other

warrants or anything in any other case?

A. No. It all relates to this one.

**{¶ 22}** After the Exhibits were admitted, the State again moved the court to amend the indictment to reflect the testimony and evidence presented, and the court permitted the amendment over Silcott's objection. The court noted that the amendment "did not increase the level of the offense. From the beginning, from the Indictment, I advised it was a felony of the second degree. So he would have had the same penalties in mind. There's no prejudice or harm in that respect." The court noted that the "change from the amount of bulk to a larger amount of bulk is still something that you can compensate for. It is what it is. Either it's less than five times or five to fifty but it's the same concept. * * * it changes the elements in some respect but really only the description of what it is, not anything that wouldn't be something you could anticipate." According to the court, the "essential elements remain the same. It's just a different number of one element."

**{¶ 23}** In a written decision on October 18, 2017, the court indicated in part as follows regarding the amendment of the indictment:

The Court announced its approval of the amendment for the following reasons: (a) the penalty was originally * * * announced as a second degree felony and the amendment does not raise the level of the offense as announced; (b) the "bulk amount" element did not change while the facts necessary to prove the "bulk amount" did change; (c) the Court considered Criminal Rule 7(D), *State v. Jester*, 32 Ohio St.3d 147, 512 N.E.2d 962 (1987) and *State v. Lynn*, 129 Ohio St.3d 146, 950 N.E.2d 931, 2011-Ohio-2722.

**{¶ 24}** The court further noted as follows:

The Court considered from Count I the language of whether "the offender, two or more times previously has been convicted of or plead guilty to a felony drug offense."   If proven, the sentence would require mandatory imprisonment for a third degree felony instead of only a preferred imprisonment.   The question is whether there must be convictions for two or more felonies or whether there have been convictions on two or more occasions. In this case, per Exhibit 38, the Defendant was convicted on September 16, 2011 of two felony drug offenses in Case No. 11-CR-00043. The Court finds that the two different offenses in that single case meet the statutory definition.

**{¶ 25}** In a footnote, the court noted that "the concept of merger for allied offenses is considered differently today than in 2011; whether that matters is not considered since the record is devoid of necessary facts.   Although discussed on the record, the Court finds no application of the principles set forth in *State v. Fittro*, 66 Ohio St.3d 16, 607 N.E.2d 447, 1993-Ohio-172."

**{¶ 26}** We note that in Silcott's judgment entry of conviction, the court noted that, at "the Court's insistence, the matter was not referred for preparation of pre-sentence investigation, and the Court then proceeded with sentencing with a former pre-sentence report and recent pre-trial report."   The reports are not in the record before us and were not marked and identified as exhibits on the record.

**{¶ 27}** Silcott asserts four assignments of error herein.   His first assignment of error is as follows:

THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 28} According to Silcott, "the judge lost his way in two regards. First, there was insufficient evidence to establish that Mr. Silcott was guilty as the search warrant was invalid and the only witnesses lacked credibility. Second, without a doubt there was insufficient evidence to establish two prior convictions justifying the mandatory sentences."

{¶ 29} Silcott asserts that Hampshire and Tim H. were "biased. Both witnesses were under agreements with the state for the testimony and, therefore, * * * both had substantial motivation to accuse and otherwise point their fingers at Mr. Silcott." He asserts "both witnesses were admitted drug addicts." According to Silcott, Tim H. "even admitted he brought many of the items found in Mr. Silcott's home to Mr. Silcott only days before." He asserts that "although evidence found at the scene could arguably support the Judge's findings, the fact remains that most, if not all, of such evidence was brought to the residence by the state's main witness."

{¶ 30} Silcott further asserts that "the only evidence presented to support two prior convictions occurred during the testimony of Detective Clark. During such, although Detective Clark authenticated the Judgment Entry from a 2011 case, which contains two convictions, no further testimony was offered regarding merger analysis." Silcott asserts that if "such would merge under current law, then obviously the Judge committed reversible error in imposing mandatory sentences." Silcott asserts that the imposition of a mandatory sentence on Count I was against the manifest weight of the evidence.

{¶ 31} The State responds that "the items that [Tim H.] brought to the house

included: scales, baggies, and 'bubbles' not the methamphetamine. * * * The items according to [Tim H.] were for Appellant to use in his business. * * * According to Hampshire the gun came from other friends who brought it to Appellant the night before." The State further asserts that Tim H.'s "testimony was backed by the video of the drug transaction." The State directs our attention to State's Exhibit 38.

{¶ 32} Although Silcott's assigned error is addressed to the manifest weight of the evidence, in the body of his brief he further asserts that there was insufficient evidence of guilt. As this Court has noted:

A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two the syllabus.

In contrast, an argument based on the weight of the evidence "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion").

When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

*State v. Fields*, 2d Dist. Clark No. 2016-CA-76, 2017-Ohio-7745, ¶ 37-39.

**{¶ 33}** Having thoroughly reviewed the entire record, and viewing the evidence in a light most favorable to the State, we conclude that Silcott's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. We further conclude that the search warrant provided probable cause to search Silcott's and Hampshire's residence, and that it was not invalidated by a lack of credibility on the part of Tim H. and Hampshire. Clark testified that officers were already aware from

interviewing other drug users that Silcott was engaged in drug activity and selling drugs. Clark stated that he had known of Silcott for seven to eight years. He stated that Tim H.'s information was consistent with what the officers already knew, and they were confident in Tim H.'s truthfulness. Tim H. set up the controlled buy and the transaction went as planned, as reflected in State's Exhibit 24, the audio-video recording. Court's Exhibit 1 reflected Silcott's own detailed accounts of his access to drugs and other dealers.

{¶ 34} Regarding Count I, R.C. 2925.03(A)(1),(C)(1)(c) provides:

(A) No person shall knowingly do any of the following:

(1) Sell or offer to sell a controlled substance or a controlled substance analog;

* * *

(C) Whoever violates division (A) of this section is guilty of one of the following:

* * *

(1) If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II, with the exception of marihuana, cocaine, L.S.D., heroin, hashish, and controlled substance analogs, whoever violates division (A) of this section is guilty of aggravated trafficking in drugs. The penalty for the offense shall be determined as follows:

* * *

(c) Except as otherwise provided in this division, if the amount of the

drug involved equals or exceeds the bulk amount but is less than five times the bulk amount, aggravated trafficking in drugs is a felony of the third degree, and, except as otherwise provided in this division, there is a presumption for a prison term for the offense. If aggravated trafficking in drugs is a felony of the third degree under this division and if the offender two or more times previously has been convicted of or pleaded guilty to a felony drug abuse offense, the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the third degree. * * *

{¶ 35} As noted above, the evidence was clear that Tim H. set up the controlled drug buy, entered the residence with cash obtained from the officers, and returned with methamphetamine. Exhibit 40 reflects that the Miami Valley Regional Crime Laboratory received an envelope containing methamphetamine, from Silcott's address, "having a net weight of 6.92 grams, +/- .02 gram(s)." Further, State's Exhibit 38, a final judgment of conviction, establishes that Silcott previously pled guilty to two felony drug abuse offenses, consistent with the language of R.C. 2925.03(A)(1),(C)(1)(c), and we conclude that Silcott's argument regarding merger lacks merit. We find that Silcott's conviction for aggravated trafficking in drugs was not against the manifest weight of the evidence, and that it was supported by sufficient evidence.

{¶ 36} Regarding Count II, R.C. 2925.11(A),(C)(1)(c) provides:

(A) No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog.

* * *

(C) Whoever violates division (A) of this section is guilty of one of the

following:

(1) If the drug involved in the violation is a compound, mixture, preparation, or substance included in schedule I or II, with the exception of marihuana, cocaine, L.S.D., heroin, hashish, and controlled substance analogs, whoever violates division (A) of this section is guilty of aggravated possession of drugs. The penalty for the offense shall be determined as follows:

* * *

(c) If the amount of the drug involved equals or exceeds five times the bulk amount but is less than fifty times the bulk amount, aggravated possession of drugs is a felony of the second degree, and the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree.

{¶ 37} As noted above, Silcott's indictment charged him with aggravated possession of drugs pursuant to the above section, and it was amended to reflect the correct amount of the drug involved. Again, Tim H. obtained the drugs in the course of the controlled buy, and Exhibit 39 reflects that the Miami Valley Regional Crime Laboratory received an envelope containing methamphetamine from Silcott's address "having a net weight of 17.23 grams, +/- 0.08 gram(s)." Since that amount is five times the bulk amount of three grams, we conclude that Silcott's conviction for aggravated possession of drugs was not against the manifest weight of the evidence, and that it was supported by sufficient evidence.

{¶ 38} Regarding Count III, R.C. 2923.24(A) provides: "(A) No person shall

possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." While Hampshire asserted that Tim H. brought the scales, baggies, and pipes into the residence a few days prior to the execution of the warrant, the items were in Silcott's (and Hampshire's) possession when officers seized them from their home. We accordingly cannot conclude that Silcott's conviction on Count III was against the manifest weight of the evidence, and we find that it was supported by sufficient evidence.

{¶ 39} Finally, R.C. 2923.13 provides:

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, or use any firearm or dangerous ordnance, if any of the following apply:

* * *

(3) The person is under indictment for or has been convicted of any felony offense involving illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse * * *

{¶ 40} Since Silcott was previously convicted of two felony drug offenses, and a weapon was removed from his residence, sufficient evidence supported his conviction for having weapons while under disability, and his conviction was not against the manifest weight of the evidence.

{¶ 41} For the foregoing reasons, Silcott's first assignment of error is overruled.

{¶ 42} Silcott's second assignment of error is as follows:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING THE INDICTMENT TO BE AMENDED ON THE DAY OF

TRIAL.

{¶ 43} Silcott asserts that the amendment "effectually enhanced the indicted crime to a higher felony. Because of the untimely amendment on the day of trial, Mr. Silcott was unable to have any independent tests performed on the evidence (drugs) and, thereafter, offer rebuttal testimony." According to Silcott, the "actual alleged crime was contained in Count 2, for violations of Aggravated Possession under 2925.11(A),(C)(1)(b). However, as noted such was amended on the day of trial to allege violations under 2925.11(A),(C)(1)(c)." He argues that the amendment "had substantial consequences * * * as the charges went from a Felony 3 to a Felony 2." He argues that the "potential implications of such are obvious and should have been to the Judge, as sentencing went from a presumption of a possible prison term of 9 to 36 months, to mandatory prison of 2 to 8 YEARS."

{¶ 44} The State responds that Silcott "was always aware of the consequences of a conviction for this offense," and he "had notice of the charge against him and was aware of the amount of drugs, methamphetamine, which the State alleged he possessed." According to the State, the "amendment was a typographical error which did not alter the name or identity of the crime and falls within Crim.R. 7(D). The court granted the State's motion to amend the indictment and correct the language of Count two."

{¶ 45} As this Court has previously noted:

"The Sixth Amendment to the U.S. Constitution provides an accused in a criminal prosecution the right to be informed of the 'nature and cause of the accusation' against him. This right, like all other Sixth Amendment rights, is part of the due process of law that is guaranteed by the Fourteenth

Amendment to all criminal defendants in state court." *State v. Collinsworth*, 12th Dist. Brown No. CA2003–10–012, 2004-Ohio-5902, 2004 WL 2504485, ¶ 15, citing *Faretta v. California*, 422 U.S. 806, 818, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

Section 10, Article I of the Ohio Constitution echoes this right, by guaranteeing "the accused that the essential facts constituting the offense for which he is tried will be found in the indictment of the grand jury." (Citation omitted.) *State v. Headley*, 6 Ohio St.3d 475, 478, 453 N.E.2d 716 (1983), *clarified on other grounds in State v. Jackson*, 134 Ohio St.3d 184, 2012-Ohio-5561, 980 N.E.2d 1032, ¶ 20–21. "Where one of the vital elements identifying the crime is omitted from the indictment, it is defective and cannot be cured by the court as such a procedure would permit the court to convict the accused on a charge essentially different from that found by the grand jury." (Citations omitted.) *Headley* at 478–479, 453 N.E.2d 716.

*State v. Lackey*, 2015-Ohio-5492, 55 N.E.3d 613, ¶ 59-60 (2d Dist.).

**{¶ 46}** Crim.R. 7(D) provides: "The court may at any time before, during, or after a trial amend the indictment * * * in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged."

**{¶ 47}** As this Court further noted in *Lackey* at ¶ 62-63:

"The purpose of an indictment is twofold. By compelling the government to aver all material facts constituting the essential elements of an offense, an accused is afforded with adequate notice and an opportunity

to defend. * * * An indictment, by identifying and defining the offense, also enables an accused to protect himself from any future prosecutions for the same offense." (Citations omitted.) *State v. Sellards*, 17 Ohio St.3d 169, 170, 478 N.E.2d 781 (1985).

Amendments are not permitted where they alter an offense's degree or penalty. In these circumstances, the amendment "changes the identity of the offense." *State v. Davis*, 121 Ohio St.3d 239, 2008-Ohio-4537, 903 N.E.2d 609, ¶ 9.

**{¶ 48}** In *Davis*, the Ohio Supreme Court found plain error when an indictment was amended to "allow a defendant to be prosecuted for a higher degree of a crime. In that case there was a miscarriage of justice because the prosecution was attempting to 'increase the penalty of degree of the offense' charged." *State v. Rohrbaugh,* 126 Ohio St.3d 421, 2010-Ohio-3286, 934 N.E.2d 920, ¶ 9, citing *Davis* at ¶ 12. Specifically, Davis was indicted for selling or offering to sell Oxycontin "*in an amount less than the bulk amount, * * ** in violation of [R.C.] 2925.03(A)(1)," a felony of the fourth degree as charged. (Emphasis sic.) *Davis* at ¶ 2. In the course of the trial, on the State's motion, the above charge was amended to charge Davis with selling or offering to sell Oxycontin "*in an amount greater than five times the bulk amount but less than fifty times the bulk amount*, in violation of [R. C.] 2925.03(A)(1)." (Emphasis sic.) *Id.* at ¶ 3. "As amended, the charge was a felony of the second degree. R.C. 2925.03(C)(1)(d) ('if the amount of the drug involved equals or exceeds five times the bulk amount but is less than fifty times the bulk amount, aggravated trafficking in drugs is a felony of the second degree')." *Id.* We conclude that the facts in *Davis* are distinguishable.

{¶ 49}  Silcott's July 28, 2017 indictment charged him as follows with respect to Count II:

**COUNT 2**

| NAME OF OFFENSE | CLASS | REVISED CODE SEC(S). | DATE OF OFFENSE |
|---|---|---|---|
| Aggravated Possession of Drugs | F2 MP | 2925.11(A)(C)(1)(c) | July 24, 2017 |

shall knowingly obtain, possess, or use a controlled substance, to wit: Methamphetamine, a Schedule II controlled substance, and the amount of the drug involved equals or exceeds the bulk amount but is less than five times the bulk amount;

{¶ 50}  As reflected above, Count II charged Silcott with a violation of R.C. 2925.11(A),(C)(1)(c), a felony of the second degree, and provided notice that he was subject to a mandatory term of imprisonment ("MP"). Silcott's indictment was not denominated as a violation of R.C. 2925.11(A),(C)(1)(b), a felony of the third degree, nor did it state a presumption of a particular prison term.[1] The substantive language regarding the quantity of the drug involved was simply misstated. Silcott was aware of the amount of the drug involved in Count II pursuant to the discovery provided to him,[2] and he did not object to the admission of Exhibit 39, the lab report confirming methamphetamine in an approximate amount of 17.23 grams. Consistent with the rule in *Davis*, amending the indictment to change the amount of the drug involved to conform to the evidence did not violate Crim.R. 7 in this instance, as it did not alter the offense's degree or penalty as set forth in the indictment. Silcott's second assignment of error lacks merit and is accordingly overruled.

---

[1] R.C. 2925.11(A),(C)(1)(b) provides: "If the amount of the drug equals or exceeds the bulk amount but is less than five times the bulk amount, aggravated possession of drugs is a felony of the third degree, and there is a presumption for a prison term for the offense."

[2] The record before us contains Silcott's July 27, 2017 Request for Discovery, including reports of scientific tests, as well as the State's August 4, 2017 Certificate of Compliance with Discovery.

{¶ 51} Silcott's third assignment of error is as follows:

MR. SILCOTT WAS NOT AFFORDED THE EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 52} Silcott asserts that defense counsel acted ineffectively in that he failed to file a motion to suppress "raising the validity of the search warrant prior to trial," since "the only witness supporting the validity of the search warrant was an unreliable source." Silcott further asserts that defense counsel "failed to file Motions to find [him] indigent to avoid the imposition of mandatory fines."

{¶ 53} The State responds that Tim H.'s "word was backed by the video officers observed and heard of the drug transaction between Appellant and [Tim H.]." The State asserts that "trial counsel's failure to file an affidavit of Appellant's indigent status to avoid paying the mandatory fines does not support an ineffective assistance of counsel claim. Information regarding Appellant's financial status was not provided to the trial court for sentencing."

{¶ 54} As this Court has previously noted:

It is well established that ineffective assistance of counsel affects a substantial right afforded by the United States and Ohio Constitutions. *Strickland v. Washington*, *supra*; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). "Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance, and a defendant, in order to overcome the presumption that counsel is competent, must show that counsel's decisions were 'not trial strategies prompted by reasonable professional judgment.' " *State v. Few*, 2d Dist.

Montgomery No. 21561, 2012-Ohio-5407, ¶ 10, quoting *Strickland* at 687. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *Id.* at ¶ 11, quoting *State v. Nabors*, 2d Dist. Montgomery No. 24582, 2012-Ohio-4757, ¶ 17. "Even if unsuccessful, strategic decisions will not constitute ineffective assistance of counsel." *Id.*, citing *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Generally, the decision regarding which defense to pursue at trial is a matter of trial strategy, and trial strategy decisions are not a basis of a finding of ineffective assistance of counsel. *State v. Moss*, 2d Dist. Montgomery No. 22496, 2008-Ohio-6969, ¶ 35, citing *State v. Murphy*, 91 Ohio St.3d 516, 524, 747 N.E.2d 765 (2001); *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 52

{¶ 55} As this Court has further noted:

"The failure to file a motion to suppress does not necessarily constitute ineffective assistance of counsel." *State v. Layne*, 12th Dist. Clermont No. CA2009-07-043, 2010-Ohio-2308, ¶ 46, citing *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000). It is only considered ineffective assistance of counsel when the record demonstrates that the motion to suppress would have been successful if made. *State v. Resendiz*, 12th Dist. Preble No. CA2002-03-026, 2002-Ohio-5455, ¶ 11. The court in *Resendiz* presumed that trial counsel was effective if he could

have reasonably decided that filing a suppression motion would be a futile act, even if there is some evidence in the record to support a motion. *Resendiz* at ¶ 29. * * *.

* * *

"Where the basis of an ineffective assistance of counsel claim is counsel's failure to file a motion to suppress evidence, the defendant making that claim must prove that the basis of the suggested suppression claim is meritorious." *In re D.D.*, 2d Dist. Montgomery No. 22740, 2009-Ohio-808, ¶ 3, citing *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed. 305 (1986); *State v. Pillow*, 2d Dist. Greene No. 07CA95, 2008-Ohio-6046.

*State v. Black*, 2d Dist. Montgomery Nos. 26986, 26991, 2016-Ohio-7901, ¶ 26, 28.

**{¶ 56}** As noted under the first assignment of error, probable cause existed to search the residence after the controlled buy, and the audio/video recording supports Tim H.'s version of events. There is no basis to conclude that a motion to suppress would have been successful and altered the outcome herein.

**{¶ 57}** As to defense counsel's failure to file an affidavit of indigency, as the State asserts, the record reflects that Silcott was a well-known drug dealer over a number of years, and he supported himself and Hampshire with the proceeds of his drug dealing. He paid three months' rent on their apartment, and he told Hanes he was making "good money." Presuming that defense counsel's conduct fell within the wide range of professional assistance, we cannot determine that but for defense counsel's failure to file an affidavit if indigency, the trial court would not have imposed fines. Since ineffective

assistance of counsel is not demonstrated, Silcott's third assignment of error is overruled.

**{¶ 58}** Silcott's final assignment of error is as follows:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY IMPOSING MANDATORY SENTENCES.

**{¶ 59}** Silcott asserts that the trial court "committed reversible error when it imposed mandatory prison of 30 months on Count 1 and 5 years on Count 2." According to Silcott, the court "lacked any statutory authority to impose mandatory sentences. This is true because the Court lacked any evidence to support, beyond a reasonable doubt, that Mr. Silcott had two previous convictions."

**{¶ 60}** As noted above, R.C. 2925.03(A)(1),(C)(1)(c) requires a mandatory sentence when the evidence shows that a defendant has two or more prior felony convictions for drug offenses, and R.C. 2925.11(A),(C)(1)(c) requires a mandatory term of imprisonment upon conviction of that offense. Silcott's fourth assignment of error lacks merit and is overruled.

**{¶ 61}** Having overruled Silcott's four assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies mailed to:

Deborah S. Quigley
Daniel F. Getty
Hon. Jonathan P. Hein